May it please the court, ALZA's 373 patent claims treatment methods. The treatment methods it claims solved the problem that had stumped researchers for decades, namely how to provide effective all-day treatment for ADHD with a single administration of drug. Prior attempts to solve that problem had failed. The treatment methods claimed in the patent solved the problem by calling for administration of the drug methylphenidate in a dosage form that releases a drug at an ascending rate of release over an extended period of time. The product ALZA introduced, Concerta, to practice these claims was a big commercial success. It's one of the primary treatment options today. The district court, not surprisingly and correctly, found the claims not obvious. But the court also found the claims not infringed by Andrx's generic equivalent and found them invalid for lack of enablement. And we submit that both of those rulings are wrong as a matter of law. Now the infringement ruling turns entirely on claim construction. The district court held after trial that the ascending release rate limitation requires drug release in the first time interval after administration of the drug. We believe the specification makes clear that that construction is incorrect. Now the specification defines virtually all of the relevant terms and that's in the bottom of column 8 through column 10. The specification explains that an ascending release rate is a periodic release rate that's higher than the immediately preceding periodic release rate. Now periodic release rate in turn is defined as the total amount of drug released from the dosage form in a particular time interval as measured at the end of that interval. The first periodic interval for which a measurement can be made is the interval at T equals 1 after the drug has been administered. So to determine whether there's an ascending release rate, you compare the release rate as measured at the end of one periodic interval with the periodic release rate as measured at the end of the next periodic interval with the first possible measurement being made at T equals 1. If the second measured rate is higher than the first, you have an ascending release rate and that's true whether or not any drug is released as of T equals 1. In all of the charts that are in the specification, there's always a release in the first interval, correct? That's correct, Your Honor. There's no question the examples all include some release in the first interval. In several of the examples it's a minuscule amount, less than 1% of the total drug released. But the important thing is that the specification makes clear that release is not required in the first interval. Just to cite one example of that, the specification expressly notes that the dosage forms called for by the treatment methods may not be... Can you give us a cite to this? Absolutely, Your Honor. Let me get that for you. If we start, I think the first reference to this, Your Honor, is in column 4. Let's see. Yes, column 4, 36 to 39, Your Honor, is the first reference and it indicates there to provide for an initial rapid onset of drug action. The dosage form would comprise an immediate release layer. Then in column 8, lines 44 to 49, it's speaking in particular about the osmotic dosage forms that are described in detail there. It indicates that those dosage forms will often have a delay in release and so that if you need immediate therapeutic effect, you should add an IR coating, which is part of the preferred embodiment, but it is not a feature of the claims. The other thing I would point to, Your Honor, is in column 10 of the specification, which is where the district court found the support for requiring immediate release. In the very sentence that the district court cited, which is at column 10, lines 10 through 16, it talks about the first periodic release rate will be an increase over the non-existent pre-administration release rate unless the release is equal to zero. It expressly contemplates that. Then when you go on into the next paragraph in column 10... It's equal to zero, but that's referring to the time period, right? To release in the first period, yes, Your Honor. So the periodic release rate at T equals one unless equal to zero, meaning that there had been no release in that first hour or first time interval. Now in the next paragraph in column 10, Your Honor, it's talking about the situation where you have an embodiment that includes the immediate release coating. And it talks about the release, and I'm about line 23-24. The drug release measured at T equals one hour will generally reflect both the drug release from the immediate release drug coating and any drug release, not the drug release, any drug release from the sustained release part of the drug, indicating clearly that there could be no release in that first hour. And this ties into, Your Honors, the purpose of the invention. The purpose of this invention was not to provide immediate therapeutic effect. That had been done for decades with conventional dosing. The purpose here was to provide therapeutic effect later in the day. Wait a moment. I mean, it's both, right? No, I don't think it's both, Your Honor. Not in the claimed invention, because the immediate release part, the specification makes clear that if you need immediate therapeutic effect, you may need to put on an IR coating, because the dosage forms we're talking about here will not necessarily release immediately. Is it Concerta or Concerta? Concerta. Are some Concerta pills sold without the coating, the IR coating, and some with it? No, I believe all Concerta pills are sold with the coating, Your Honor. Before your time runs out, can we turn to enablement? My understanding of parts in this case, if we were to affirm the judge on enablement, we don't reach the infringement or the obviousness issues, right? Well, the obviousness issues, I think, are not before the court because of the 3M decision. I appreciate that. The other decisions that say you don't have to file a cross appeal to sustain the judgment. Well, that's absolutely right, Your Honor, but it depends on what kind of a judgment. And what 3M makes clear is that— The judgment of invalidity. But— All they're trying to do with the obviousness thing is sustain the judgment of invalidity. And there are plenty of cases, there are probably six, eight, or ten of them, which say that under those circumstances, you don't have to file a cross appeal. Respectfully, Your Honor, 3M makes very clear that where the judgment is not a judgment of invalidity, but a judgment of invalidity for a specific reason, an invalidity for another reason is not an alternative ground for affirming that judgment because it requires modifying the judgment. That requires a cross appeal. And I don't think there are cases holding to the contrary of that, or certainly none cited by the other side. There are plenty of cases that hold to the contrary. Well, 3M seems directly on point, with all respect, Your Honor. Let's talk about— Let's talk about enablement. I think the relevant facts really aren't disputed, and so— Do you agree with Judge Prost that, for the moment, I think her lead-in to this was, if— I did lose the question. —it's found non-enabled, that's the end of the case. The claims are invalid then, so— You don't get to the claim construction or anything else. I think that's probably right, yes. The difficulty I'm having with your position on enablement is that everything that Judge Farnon did here seems highly fact-specific. And there are factual findings, arguably credibility findings, and you're in a tough position, I think, to have us overturn that on that basis. So why am I wrong? Let me explain why I think you're wrong, Your Honor. I think the basic facts are really—they're really not a factual dispute. And I think it boils down to the ultimate conclusion of lack of enablement. It's undisputed that sustained-release dosage forms were very well-known. They've been used for decades, described in prior patents and texts, including some referenced in the patent itself. But there's nothing in this patent. There's no example in this patent of a non-osmotic release. Correct. There are references to those— And there's nothing in the patent that tells you how to make that, right? That's correct, Your Honor. So what you're having to rely on is that someone skilled in the art would know how to do it. Yes. Right? Absolutely. And you also have a situation in which ALZA never did it, right? That wasn't ALZA's business.  My statement is correct. ALZA apparently tried the LAM testimony and wasn't able to do it. And it never did do it, right? That's what the record says here, Your Honor. Yes. Right. And everybody says that it would take months of experimentation to do it, using the knowledge of someone skilled in the art. Well, here's the key, Your Honor. It would also take months of experimentation to make any sustained-release dosage form. This is not a problem specific to ascending-release dosage forms. Both sides' experts were very clear on this. It's a trial-and-error iterative process. You design a dosage form. You make the dosage form. You test it. You see whether you hit your target rate. If you didn't, then you adjust the dosage form, test it again. It's a matter of varying the thickness of coatings, varying the size of drug-containing beads, changing the shape of the matrix, that sort of thing. These are all conventional techniques, and the techniques don't change, and the amount of testing doesn't change, depending on which release pattern you're trying to achieve. Now, what the record shows here, and this is from both sides' experts, is that those of ordinary skill were very familiar with sustained-release dosage forms and with the techniques for adjusting and manipulating them to produce specific desired products. Producing any sustained-release dosage form, as I just mentioned, is an iterative process where you make the form, a dosage form, test it, see how close you are to your target, and see which way you need to adjust the dosage form. The use of those techniques to produce ascending-release dosage forms specifically had been described in prior art texts and patents, and in particular I direct the Court's attention to the 593 parent application, the parent of this patent. But apparently it wasn't so easy to do it, since ELSA wasn't able to do it. Your Honor, the evidence here is, all we have is the testimony of Mr. Lamb about efforts by somebody else for a couple of months to try to produce a particular kind of non-osmotic dosage form, a matrix dosage form. We know nothing about what they tried, how intensive the effort was, even who it was. It was ELSA, right? Well, it was somebody at ELSA, but we know nothing about their level of skill. And again, remember, ELSA was an osmotic dosage form company. That was its business, that's where its expertise lies. So that evidence does not show non-enablement by a long shot. Yeah, but this all goes back to the fact that in the claims they were construed broadly, as ELSA insisted and argued, to include non-osmotic as well as osmotic. That's why we're here. Oh, absolutely, Your Honor, absolutely. I'm just having a hard time comporting your theory, which is it was known in the art, let's assume the judge even found that, but it would still require experimentation, but that's somehow undue. And comporting that with the language of the statute, which says full, fair, concise, and exact terms. Never has Congress spoken with such specificity, I think, in terms of saying what's required to enable, right? Right. So how are you complying with the statute in the absence, as Judge Dyke suggested, of anything in the specification? Well, Your Honor, I think this Court's cases are pretty clear that you don't have to reproduce in the patent techniques that are known in the art. Now, the osmotic technology was a new technology, so that's described in detail. But these other dosage forms, the matrix dosage forms and the other erodible systems and that kind of thing, those were known for decades, along with how you adjust the release rate. But that might be true if it were easy to do it, but the record shows that it wasn't easy to do it, and the District Court found it wasn't easy. Your Honor, easy, and it ties into the term undue experimentation, it was, in fact, standard practice for those of skill in the art. It wouldn't be easy for me, certainly, but this is what these people do. Needham, Andrick's expert, said it would take an experienced formulator a month or more to make any dosage form. It's not a problem of ascending release, it's a problem of any dosage form, any sustained release dosage form. And, in fact, here ascending release dosage forms had been made using these techniques. It would take a month or more unless you were told how to do it in the specification. No, he said it would take a month or more with the guidance in the specification. With what guidance? There wasn't any guidance in the specification. As to osmotic dosage forms, he was speaking with reference to that. And he said, but it's an experienced formulator with the knowledge of how to do it. It takes a month or more because, again- Did he say that about osmotic dosage forms? Where does Needham say that?  I will find that for you, Your Honor. I believe it's at appendix page 12, 719. Yeah, where? And if you look at, I believe it's transcript page 707, and you'll see the question there about line six, and one of ordinary skill in the art with the disclosure of the 373 patent, making an osmotic form dosage form, and talks about the one month. And this is sort of summarizing the testimony that precedes it. But he's talking about with an enabling disclosure, it would take one of skill in the art a month or more to make the dosage form. And that's perfectly consistent with the testimony of Alice's expert, that that was standard in the- Yeah, but the district court does sort of refer to that. But he then, when he cites Dr. Needham's testimony, he goes on to then say, get additional evidence, blah, blah, blah. And he refers to Hamill's testimony. He had already referred to Lamb. And he discounts Dr. Davies. He's a fact finder. Well, he is a fact finder. Even if you discount Dr. Davies' testimony altogether, I think- Which he did. And he analyzes why he wasn't persuaded by what Dr. Davies said. If you look at Needham's testimony, Andrix's expert, and in particular direct the court to, for example, appendix pages 12, 721 to 22, where he goes through the disclosure. He's taken through the disclosure in the 593 parent application, which talks about the non-osmotic dosage forms and how you could use them to provide ascending release. And he goes through example by example, and he confirms that, yes, these techniques were familiar to one of skill in the art and could be used by one of skill in the art. So I think even if you ignore Dr. Davies' testimony altogether and you look just at Needham's testimony, it shows that there was not clear and convincing proof of non-enablement here. No, the problem I have is accepting that with respect to Needham, Judge Farnan is the fact finder here, and he does acknowledge what Needham said but goes on to say, but this is all that Dr. Hamill or Mr. Hamill said. This is what Mr. Lamb said. So isn't he free to discount conflicting evidence or conflicting testimony and find what he feels is the most persuasive? Are you suggesting that the clear and convincing evidence standard doesn't allow the fact finder to do that? No, clearly, obviously the clear and convincing evidence standard. So let's accept everything you said about Dr. Needham and his testimony. How does that necessarily require a reversal, given the other testimony that the judge relied on? Well, the other testimony, and you referenced Hamill and Lamb, Hamill talked only about osmotic dosage forms. There's no dispute that those are enabled. There's also no dispute that the, in fact, the judge himself even said. There were specific examples of osmotic dosage forms, right? Yes, yes. My point is. So with respect to the osmotic dosage forms, there wasn't any necessity to go into this trial and error thing because the patents told you specifically how to do it and gave examples, right? It's still not clear that you don't. I don't think the record's clear that you still didn't need some trial and error. In fact, I think that's what Needham's testimony indicates, that even with that guidance, you're still talking about a month or more. Well, he's not talking about the examples in the patent, is he? I think he is, because he was talking about the guidance provided in the patent. But getting back to Hamill, Hamill was talking only about his efforts on osmotic dosage forms. There's no dispute those are enabled. And the judge's reasoning there was, well, why would ALSA have spent all this time on osmotic dosage forms if non-osmotic dosage forms could be done so easily? Well, there's no evidence at all to support that, and it completely ignores the fact that, as I mentioned earlier, ALSA's business was osmotic dosage forms. It had patents on osmotic dosage forms. And so that's, you know, it's like saying, why doesn't Pepsi make 7-Up? Well, Pepsi's business is Pepsi. And as for Ham, we talked about that a little bit earlier, it's general testimony describing some efforts by somebody to make a matrix dosage form at ALSA with no evidence about who, what their skill level was, what they did, you know, how intensive the efforts were, whether this was a part-time thing or whether it occupied all their time for some period of time. So... Wasn't the judge entitled to assume that they had competent people doing it? I don't think the judge was entitled to assume that they had people of ordinary skill in the art doing it, not in the absence of any evidence. Really? Yeah, really. Well, you dispute the judge's finding with respect to who one of the skilled... We do, Your Honor. Both sides submitted that that person should have some experience in controlled-release products, in developing controlled-release products, and the judge didn't include that in his formulation of the person of ordinary skill, the standard of ordinary skill. Thank you, Mr. Truong. We'll restore your rebuttal time. Mr. Musgrove? Yes. May it please the Court, my name is Kyle Musgrove. I'm here today, obviously, on behalf of the Defendant Appellees. Going specifically to the questions that were just asked on enablement, we agree with, I think, what the Court has articulated to this point, that this was a highly specific fact-finding. And with regard to the portion that was cited... We were just giving the other side a hard time. No, I'm just... We didn't really mean... Let me ask you. Yeah, sure. What are we left with here? If indeed... Do you disagree with the other side that Hamill dealt with was... The testimony on Hamill was osmotic and not non-osmotic? Hamill was certainly speaking about osmotic. I think the point there that the District Court made, and I think the point that we made below, which the District Court accepted, is if it's so easy to make these other dosage forms, why are you going to such complication? Understanding that ALSA is, by and large, an osmotic company, but they do do other things, transdermals and some other things. But having said that, the point is this. If it's so easy, if you've got such a broad invention, nobody had ever thought of ascending release rates before, nobody had ever thought of ascending plasma profiles, and you've got broad coverage for that, certainly it's the case that not every company stays with a particular dosage form. If it's simple to do these things, why wouldn't you do them, number one? Well, simplicity is not the criteria, though. Understood. The criteria is undue experimentation. So what is in the record to persuade us that undue experimentation was required? I think undue experimentation, one, that's all the WANs factors. So I think that's all eight factual findings that the District Court went through, specifically addressing the point that was made about Dr. Needham. The point, with all due respect, was not made, as Judge Dyke pointed out, I don't think, about I was there, about the specific examples and replicating those. It was, OK, if you went from those to a different osmotic dosage form, what would happen? It might take you about a month to get it. If you went to any other dosage form... So we have specific examples as to the osmotic form. That's right. And you're not challenging enablement with respect to that? Certainly not, Your Honor. No examples with respect to the non-osmotic form. They say they're relying on someone skilled in the art, and they're saying that the fact that it would take a month or more to do that is not a problem. What's your response to that? Well, first off, Dr. Needham's testimony continues on, on the same page, JA12719, and I would point the Court to the trial transcript bridging page 707 to 708. He specifically asked, beginning around line 17, if you were to try to develop additional tablets that are non-osmotic, how much guidance would the 373 patent give you? Almost none. So where would it fall in the continuum if we start at one month, saying that, obviously, as you develop the dosage forms, some are enabled here like osmotics, others are not, he says well into probably six months or so, or more, for one dosage form. Now, I think it's important here that we recall we're talking about a scope of enablement. Which he characterizes as an excessive period of time. I agree. I agree that that's, one, how he characterizes it, but, two, I think it's important to remember that we're talking about a full scope enablement case here. We're not talking about what have been undue experimentation to make one other dosage form. We're talking about a multiplicity of approaches, which the court recognizes, which the patent itself recognizes. And full scope enablement, I don't know that it requires, obviously, you claim 1,000 dosage forms and we enable them. We specifically teach 1,000. I don't think that's the rule. But it certainly is the case that if you have 10 different approaches, and at most you're going to get one additional with six months, when you start complicating that, I do believe that's undue, but I think that's exactly what you want to do. I'm not calling that. It doesn't seem to me that you've argued, it seems to me that you've agreed that if one non-osmotic dosage form was enabled, that that would be sufficient. We have not ever agreed with that, Your Honor. You don't agree with that? No. What is your position on that? Our position is that full scope enablement requires enablement of all the dosage forms that are claimed in the patent. And here, the dosage forms, as was stated, were interpreted very broadly. And the district court specifically notes around JA 103 that there are multiplicity of approaches here. So just because, even assuming... What would they have to do? How many non-osmotic dosage forms would have to be enabled to satisfy the enablement requirement? Well, one, I think it depends obviously on the scope of the claim, and that's a question here. Here we have any dosage form that has this ascending release rule. Well, suppose it includes the suppositories and the lozengers and all that stuff. Well, one... Are you saying that each one, they'd have to enable a lozenger form? Well, I believe this court's law supports that fact, that you have to have full scope enablement... I thought, didn't the district court reject the full scope argument? No, no. All of this is full scope ultimately, Your Honor. Yeah, but you were making a scope argument. But if you're talking about specifically as a matter of law that the claims are just too broad, yes, the district court did reject that. I would agree with that. Well, under the district court's interpretation, what's your contention as to how many non-osmotic dosage forms would have to be enabled? I don't think that this court's case law establishes firmly what amount is required. What it does establish is that it has to be commensurate in scope with the claims. What I think, if you look back to the... Yeah, but what's your contention? Our contention would be, if the claims are read this broadly, you actually wind up back in with O'Reilly versus Morse, you wind up with General Electric, which are claims that are limited only by their function and claim... The word here, dosage form versus... I mean, everybody agrees. The OZ agrees that they'd have to enable at least one non-osmotic dosage form, and there's evidence that that might take a considerable amount of work, and there's a question of whether even one of them is enabled. Okay? Put that to one side. Let's assume that we're addressing the question of how many dosage forms need to be enabled. What's your position as to, under the claim construction we have here, what do they have to do? How many other, besides the one, would they have to enable? Our position is, if you're talking about the full scope of the claim, it goes back to our argument, as a matter of law, that claims that are this broad are invalid. Here, I don't think I can give you a definitive answer because we don't know the number of dosage forms. It's not like some of this court's cases, like ATI, where you've got two. If we're talking about thousands and thousands... That answer means that it's always going to fall enablement, no matter what they said. I'm sorry, I missed the question. Under that theory, it's going to feel under enablement, no matter what, because there always could be more additional dosage forms. Depending on what the scope of the claim is. What we're saying is, effectively, what we've contended from the beginning here, in addition to the fact that... Maybe we ought to go back to what the district court... Let's go to the district court. Let's go back to the district court. What is your reading of what he concluded, with respect to what he would have found sufficient for enablement and not? I'm sorry, I missed the last part of the question. Rather than your view of what would be sufficient for enablement, what was the district court's... The district court certainly looked at whether or not any other specific dosage form would be enabled. There's no question that that's the standard he applied. He went through a very detailed fact-finding under the Wands analysis that specifically says there's no evidence here that anybody could do this. Lamb was skilled. There's no question about that. We've put forward that evidence in our brief. You're saying not even one was enabled? He said not even one was enabled. Yes, I agree with that. I would say that's still a full scope, but not the same argument, certainly. The scope of the claim includes more, and they didn't enable these other items. Certainly, that's what he said. With regard to the factual findings, we've been through some of those. Lamb, Hamill. We would also say you look at the provisionals, which he relied on, which specifically said there was a long-felt need for these things, for these types of dosage forms, and also that the art here was unexpected and a breakaway as far as something to do. All those facts, in addition to Needham's testimony, in addition to discounting Dr. Davies' testimony, which he was entitled to do as the final fact, all support his finding here. I think this court can affirm, certainly, just because it's a factual finding, although enablements were viewed de novo, his factual findings under WAN certainly support the argument here in question. I did want to address one question on obviousness, and perhaps it may not be addressed, but since counsel raised it and Judge Dyke responded, there's certainly cases that we would submit that talk about non-waiver here. Specifically, it's a non-precedential opinion, but a case that we believe directly is on point is MEMC, Electronic Materials Incorporated v. Tsubishi. It's 248 Fed App, APX 199. In that case, specifically, mirrors this case. There was a finding of summary judgment of non-enablement, of summary judgment of non-obviousness the other way. The final judgment orders entered that way. Specifically, it was held, not only was it not waiver, cross-appeal in that situation, where you're only seeking to affirm the ultimate judgment of non-enablement. Was that before or after the case that Mr. Trello relied on? It's certainly after Kim K. and I will say that it obviously is non-precedential, the 3M case. So you haven't been able to find a precedential opinion? No. Your Honor, ultimately, all these cases relate back. I was talking about a case that was directly on all fours with this case. Ultimately, a number of these cases refer back to Bailey v. Dark Container Corp., which is before the 3M case. It doesn't affect the scope of the judgment. You can defend the judgment on that case. Right, and cases have certainly applied that over and over, and a number of cases specifically held, if you're just arguing a different basis of invalidity, you don't need to cross-appeal. In fact, it's improper to cross-appeal. Turning to the claim construction point very quickly, one, in this situation, we would argue that the judge, specifically at JA 25 to 26, said that his claim construction, which was Alza's claim construction, specifically included the requirement that you have a sending release starting at T equals zero. Given that they won their claim construction, we believe that they're stopped from arguing differently here based on the judge's finding. However... Well, that particular twist, though, I mean, that's a little unfair, is it not, to put that particular twist on? I mean, you're not suggesting that the judge revised it, and nobody's arguing that. Well, no, they are arguing. They're arguing that he reconstrued the claims. They're saying that he revised it. What I would say is, while we believe they're stopped, certainly we think if you go to the specification itself, the specification supports the judge here. With all due respect to my colleague, I don't understand why we start piecing together what an ascending release rate is and what an extended time period is when the entire phrase, ascending release period over an extended period of time, is defined at column 10, lines 41 through 52 of the specification. And that portion specifically says that you have an ascending release rate starting from the time of administration. Column 8 in the definitional section, lines 57 through 61, specifically state that the time of administration is T equals zero. And so, therefore, you have to have an ascending release from the time point of T equals zero. When you look up to column 10, and it's like reading a story here, well, how do you determine whether or not there's an ascending release rate during the first time period? You determine that by saying, is there any release if it specifically says that you look at the immediate preceding time period, which is by definition zero. So you look at that, as long as you have some release, the next portion of the specification says we don't count IR release with regard to the extended release component with regard to the ascending release calculation. So that pieced together is a storybook as to why you need ascending release or why the definitions require ascending release in the first time period, and they don't include the IR. All the examples support that. When you look at all of them, whether they be examples one and two, which have no IR code, or examples three and later, which do have IR codes, all of those have release in the first time period. So I think based on the express definitions in this case, you specifically have a requirement of ascending release from the time point equals zero. Now, with regard to the question that was raised about since it says unless equal to zero or any, certainly we're not saying that it was not contemplated here, that you might have a situation where you have no release from the ER. What we're saying is by these definitions, they specifically did not claim that. They specifically require that you don't count the IR and that you have release during the first time period. So given those specifications in column 10, we think that's the way it reads. I don't think there's any real argument, and the court certainly found those paragraphs unambiguous. So with regard to claim structure, we believe that's where that lies. I'm happy to address any other questions the court may have, but otherwise I'll yield my time. Thank you, Mr. Musgrove. Mr. Trella? Thank you, Your Honor. Turning to enablement first, this is not a case like the automotive technologies case where you had specific expert testimony not just asserting, oh, this would be difficult to do, but identifying specific problems with the new technology that would present obstacles for somebody of ordinary skill in the ER. What you have here is you have an expert saying, oh, this would be hard, this would take a lot of time, this would be very difficult, with no explanation of why, no backup for that at all, no explanation of what's different about ascending release dosage forms from all these other dosage forms that have been made for decades. And, in fact, the testimony is that there's not anything different. It's the same techniques. You use the same techniques to make a descending rate, a constant rate, an ascending rate. It's just a matter of picking different sized beads, different coating thicknesses, different layers of drug. It's a matter of adjusting the size of the layers. So we have an expert's assertion, essentially an assertion on the ultimate question, that this would take undue experimentation with no factual backup. And that's the fundamental problem with the district court's conclusion here, we think. Now, ascending release dosage forms, in fact, had been made. As we pointed out in our brief, it was a problem set in an undergraduate textbook from before the time of this. The record contains patents, like the 214 patent from 1971, I think, describing a particular form of ascending release, this non-osmotic ascending release dosage form. So the notion that this was somehow surprising new technology that would take an experienced formulator untold effort to produce is just not supported by the actual facts. It's a conclusion, but it's not supported by the evidence. Now, on this question of the full scope of the claims, the enablement decision turns on specifically and only on oral non-osmotic dosage forms. That's all that the judge construed the claim somewhat more broadly, but his ruling was based solely on that. Capsules and tablets, right? Capsules and tablets, exactly. Now, the claim construction would go somewhat broader than that and would be any dosage form that could be subjected to dissolution testing, but there was absolutely no evidence presented as to any non-oral dosage form other than transdermal patches, and both sides' experts agreed that, in fact, those could be made with an ascending release rate. To enable the full scope of the claim, do you have to enable both capsules and tablets? I don't think that you necessarily have to enable both, Your Honor. I think there are different non-osmotic technologies. There's erosion, there's diffusion, there's different kinds of non-osmotic dosage forms. I think to the extent that there's a showing that the techniques for one are very different from the techniques for another, you might have to separately enable them, by which I mean either in the patent or in the knowledge of one of ordinary skill in the art. But I don't think you necessarily... For example, one of these textbooks that's cited in the record identifies 10 different non-osmotic dosage forms. I don't think you necessarily would have to show that each and every one of those could be made with an ascending release rate without undue experimentation. Why not? Because many of them utilize the same basic techniques. You vary the release rate by varying the thickness of a coating, by varying the thickness of a drug-containing layer, that sort of thing. So to the extent that you're really talking about the same techniques and people of ordinary skill in the art would understand that the techniques are transferable from this capsule to this tablet, I don't think you would have to separately show that. But perhaps by saying that, I've said that it in fact is enabled because a person of ordinary skill in the art would know how to do it, which, of course, is our view of what enablement in this kind of a case requires, where you have both novel ways of performing the method and ways of performing the method that are quite conventional. Now, turning to the claim construction point, the specification, as counsel noted, acknowledges the possibility that there may be no release in that first period. I think it's significant that in column 10, where it does that, and I'm in the paragraph that begins at about line 18 in column 10, it's talking about dosage form embodiments. It's not talking about just random dosage forms. It's talking about dosage forms that embody this, the dosage form embodiments that are used in this invention. It's talking about any sustained release, not the sustained release. It clearly contemplates that there might be no release. Significantly, it goes on to say that in determining whether there is an ascending release rate, you compare the release rate at T equals 2 to the release rate at T equals 1 while disregarding any immediate release coding. It doesn't say anything about going back to T equals 0 before the drug was even administered. Thank you, Mr. Trelawney. Out of time. Thank you, Your Honor. Thank you. These are submitted. All rise. The Honorable Court will be adjourned until tomorrow morning. Good day.